IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

DEPARTMENT OF EDUCATION,       )      CIVIL 16-00106 LEK-BMK
STATE OF HAWAII,               )
                               )
          Plaintiff,           )
                               )
     vs.                       )
                               )
LEO W., by and through his     )
Parent VERONICA W.,            )
                               )
          Defendants.          )
_____ )

**ORDER VACATING IN PART, REVERSING IN PART, AND AFFIRMING
IN PART THE HEARINGS OFFICER'S FEBRUARY 10, 2016
<u>FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION</u>**

On March 9, 2016, Plaintiff Department of Education,

State of Hawai`i ("Plaintiff," "the DOE" or "Respondent"), filed

an appeal of the Administrative Hearings Officer's ("Hearings

Officer") February 10, 2016 Findings of Fact, Conclusions of Law

and Decision ("Decision").[1]  [Complaint (dkt. no. 1).]  Plaintiff

filed its Opening Brief on July 8, 2016.  [Dkt. no. 14.]

Defendants Leo W. ("Student"), by and through his Parent,

Veronica W. ("Mother," collectively "Defendants" or

"Petitioners"), filed their Answering Brief on August 8, 2016,

and the DOE filed its Reply Brief on August 23, 2016.  [Dkt.

nos. 16, 18.]  The Court heard oral argument in this matter on

October 31, 2016.  After careful consideration of the briefs,

_____

[1] The Decision is part of the Administrative Record on
Appeal, transmitted on October 12, 2015 ("AR"), at 117-47.

record, arguments of counsel, and relevant legal authority, this Court HEREBY VACATES the portion of the Decision addressing Child Find, REVERSES the Hearings Officer's ruling that the DOE's failure "to conduct needed behavioral assessments" denied Student a free appropriate public education ("FAPE"), REVERSES the reimbursement award, and AFFIRMS the Decision in all other respects.

<u>**BACKGROUND**</u>

At the time of the Decision, Student was six years old and was eligible for special education and related services under the category of developmental delay.  He has also been diagnosed with Autism Spectrum Disorder ("ASD") and attention-deficit/ hyperactivity disorder ("ADHD").  [Decision at 2-3, 18.]

**I.    <u>Attendance at the Home School</u>**

Student began attending the Home School in June 2013, when he was approximately three-and-a-half years old.  He was enrolled in the school's Head Start preschool program.  Head Start includes students from economically disadvantaged families. At the Home School, ten percent of the students in its Head Start program are special education students.  Head Start is an inclusion program in a fully self-contained classroom.  [<u>Id.</u> at 3, 18.]

Student attended the Home School's preschool for the 2013-14 and 2014-15 school years.  His first individualized

2

education program ("IEP") was developed in the 2013-14 school year. [Id. at 18.]  Student's special education teacher for that year ("2013-14 SPED Teacher") did not testify before the Hearings Officer.  During that school year, the 2013-14 SPED Teacher created a behavioral support plan ("BSP") for Student.  Thus, the Hearings Officer found that Student's January 14, 2014 IEP ("1/14/14 IEP") and April 4, 2014 IEP ("4/4/14 IEP") "had a BSP as a supplemental aid when appropriate."[2]  [Id. at 3.]  Student's classroom for the 2013-14 school year was a fully self-contained classroom, and Mother testified that Student did well in the class between February and May 2014.  [Id.]

Student's May 22, 2014 IEP ("5/22/14 IEP") did not include a BSP, but it did offer Student extended school year ("ESY") services during Summer 2014.  At the due process hearing, the principal of the Private School,[3] testified that the 5/22/14

---

[2] The 1/14/14 IEP lists a BSP as a supplementary aid from February 18, 2014 to November 18, 2014 "when appropriate."  [AR, Respondent's Exh. 6 at 74.]  However, it also states that a BSP **may be developed** with the support of the counselor upon parental consent and classroom observation."  [Id.]  The 4/4/14 IEP includes the same language.  [AR, Respondent's Exh. 7 at 87.]

[3] The Court will refer to the facility that Student attended after the Home School as "the Private School" for the sake of simplicity.  However, the Court notes the Hearings Officer found that, at the time of the Decision, the facility was "not licensed as a school, but [was] in the process of obtaining a license and accreditation."  [Decision at 10.]

The Private School Principal was the owner of the facility until it became a nonprofit organization.  There is now a board
(continued...)

IEP's present levels of education performance ("PLEPs") section regarding Student's social and emotional skills was consistent with the Private School's current observations of Student.  [Id. at 4.]  The Parent Concerns section of the 5/22/14 IEP stated that Student: lacked social skills, including playing appropriately with other children; had "depressive spells" that could last over a week; had violent tantrums at home and had a hard time calming himself down.  [Id. at 5.]  It also noted that the family was receiving parent-child therapy, which seemed to be helping, and that Mother had noticed that Student's behavior and attitude had improved since he started school.  [Id.]  Student's last IEP before the May 18, 2015 IEP ("5/18/15 IEP") – which is at issue in this case – was the October 21, 2014 IEP ("10/21/14 IEP").  The 10/21/14 IEP did not include a BSP, but did provide for ESY services.  [Id.]

Student's special education teacher during the 2014-15 school year ("2014-15 SPED Teacher") testified at the due process hearing.  Student's preschool classroom during the 2014-15 school year had eighteen students, with Student being one of four SPED students.  The 2014-15 SPED Teacher testified that the class was highly structured and that the students were expected to follow

---

[3](...continued)
of directors that "make[s] the overall decisions" for the school, while the principal makes decisions regarding daily operations. [AR, Trans. of 12/16/15 Proceedings ("12/16/15 Trans.") at 10-11.]

class rules and schedules, and to perform academic and
developmentally appropriate activities.  The 2014-15 SPED Teacher
testified that, by the end of the year, Student was at the same
level, academically, as the general education students, and he
was ready for kindergarten.  She also testified that he had made
progress in his interactions with peers, and his play was
appropriate.  According to the 2014-15 SPED Teacher, Student's
behaviors were typical for a five-year-old.  He did throw things,
but he did not have tantrums.  [Id. at 5-6.]  The DOE district
preschool resource teacher ("DRT") testified that Student's
behavior at the Home School was typical of other preschool
children and that Student was not aggressive.  However, the DRT
last observed Student in the classroom in October 2014 and on the
playground in 2015.  Further, the DRT was there to observe the
class in general, not specifically to observe Student.  [Id. at
6-7.]

**II.  5/18/15 IEP**

Student's 5/18/15 IEP provided the following: 1765
minutes per week of special education from May 20, 2015 to
July 28, 2015 in a general/special education setting; 300 minutes
per week from July 29, 2015 to May 14, 2016 in a general
education setting; 180 minutes per quarter of speech-language
therapy; daily transportation services; and preferential seating
as a supplemental aid.  [Id. at 12-13.]  The 300 minutes of

special education services that Student was to receive in an inclusion setting during kindergarten was for language arts and math.  The 2014-15 SPED Teacher testified that this was appropriate based on Student's level of functioning.  [Id. at 13.]  The 5/18/15 IEP provided that Student would be with general education peers from 8:00 a.m. to 2:00 p.m. every day except Wednesday, when it would be from 8:00 a.m. to 1:00 p.m.  He would be with only special education peers during the other times during the school day.  [Id. at 16.]

According to the Decision, Mother asked the IEP team why the BSP was being removed, and she testified that the 2014-15 SPED Teacher told her that a BSP was not necessary because Student would be in an inclusion classroom.  The 2014-15 SPED Teacher testified that behavioral modifications were done for the entire class.  [Id. at 13.]  Mother testified that she expressed her concerns that the 5/18/15 IEP did not include any behavioral goals and that Student needed a behavioral assessment.  According to Mother, the team heard her concerns, but did not act upon them.  [Id. at 16.]

The 5/18/15 IEP stated that Student did not qualify for ESY services.  The IEP team considered four factors in deciding that he was not eligible: "the nature and severity of the disabling condition, Student's ability to be self-sufficient, regression, and recoupment."  [Id. at 13.]  The 2014-15 SPED

Teacher told the IEP team that her data about Student did not show that ESY services were necessary because he was performing at his grade level and did not show any problems with recoupment or regression.  For example, she testified that, after a three-week break during the 2014-15 year, Student returned to school ready to learn, but she did not address whether he had regressed. According to the 2014-15 SPED Teacher, Mother did not oppose the finding that Student was ineligible for ESY services.  The Home School Vice-Principal testified that the entire team agreed that Student did not need ESY services, but Mother testified that she did express her concern that Student would regress without ESY services.  [Id. at 13-14.]

In the 5/18/15 IEP, the social-emotional section of the PLEPs stated, *inter alia*, that Student was comfortable in the classroom, dealt with transitions well, followed class rules and routines, participated in activities that he did not choose, and got along well with his peers.  It stated that he had no social-emotional needs at the time.  [Id. at 14-15.]  The 5/18/15 IEP did not identify any social or behavioral goals.  [Id. at 16.]

Mother testified that she disagreed with the PLEPs at the May 18, 2015 IEP team meeting, and she told the team that Student's behaviors had gotten worse during the 2014-15 school year.  The DOE representatives on the team responded that the problematic behaviors were only occurring at home, not at school.

Mother also disagreed with the lack of behavioral goals, and she asked for a behavioral assessment, but the team did not act on her concerns and requests, other than mentioning the concerns in the Family/Medical section of the 5/18/15 IEP. [Id. at 15-16.] At the due process hearing, the Private School Principal disagreed with the social-emotional PLEPs in the 5/18/15 IEP. Mother testified that Student did misbehave at the Home School and needed redirection, but she admitted that he needed constant supervision at home. [Id. at 15.] The 2014-15 SPED Teacher confirmed that Mother had previously reported "Student was defiant, aggressive, not listening, and depressive at home." [Id.] The 2014-15 SPED Teacher also testified that Student's in-school behaviors discussed at the May 18, 2015 IEP team meeting were typical of a student his age. According to the 2014-15 SPED Teacher, Mother saw a draft of the 5/18/15 IEP before the team meeting, but Mother did not question the social-emotional PLEPs at the meeting. [Id. at 16.]

The Hearings Officer found that the social-emotional PLEPs in the 5/18/15 IEP were inconsistent with the testimony of

DOE district psychologist Abby Royston, Ph.D.,[4] and J.F.'s report.[5] [Id.]

The May 18, 2015 prior written notice ("5/18/15 PWN") stated that the DOE proposed to modify Student's program such that Student would remain in his inclusion preschool classroom for the remainder of the school year and move to a general education kindergarten classroom for the 2015-16 school year. The 5/18/15 PWN stated that the specialized instruction that Student needed could be provided in the general education setting. [Id. at 16-17.]

## III. Move from the Home School to the Private School

Student last attended the Home School in May or June 2015. Mother disagreed that Student had the skills the DOE representatives attributed to him when he left the Home School. According to Mother, Student was only happy at the Home School because they "did not make him do anything, and let Student be in

---

[4] Dr. Royston is the lead DOE psychologist for the Windward District. [AR, Trans. of 12/17/15 Proceedings ("12/17/15 Trans.") at 337.]

[5] The Hearings Officer's reference to "the report by psychologist J.F. regarding Student's emotional and social behaviors" presumably refers to Janet Fitzgerald, Ph.D. [Decision at 16.] Dr. Fitzgerald was one of Petitioners' witnesses at the due process hearing, but there is no report by Dr. Fitzgerald among Petitioners' exhibits. The Hearings Officer may have been referring to Dr. Fitzgerald's testimony or to a one-page letter by Dr. Fitzgerald, dated October 22, 2015, that was among Petitioners' exhibits. [AR, Petitioners' Exh. 1 at 78.]

control." [Id. at 6.]  For example, if Student was upset, the 2014-15 SPED Teacher allowed him to withdraw from the activity he did not want to do.  Mother also testified that the goals the Home School set for Student were not challenging enough for him. [Id.]  The Hearings Officer found that Mother pulled Student out of the Home School "as he was not being provided proper supports." [Id. at 9.]  The Private School Principal testified that Student needed more than 300 minutes per week of special education services and that Student needed ESY services. [Id. at 14.]

Because the 5/18/15 IEP denied Student ESY services, Mother placed him in the Summer Fun program, at the DOE's suggestion. [Id.]  The Hearings Officer found that, "[a]ccording to Mother, the Summer Fun program was administered by college students who were not trained.  The program was not structured, and Student was isolated." [Id. at 9.]

In July 2015, Mother applied to enroll Student at the Private School, and he began attending the Private School on August 24, 2015.  The Hearings Officer found that the Private School had approximately twenty-five students, from age five to age seventeen.  The other students in Student's age group were: a five-year-old, a seven-year-old, two eight-year-olds, and a nine-year-old. [Id. at 10.]  The Private School "is located in several different rooms within a shopping center," but "there is

a grassy area and a nearby park that the [Private School] students use at times during the daily recess." [Id. at 11.]

The Hearings Officer found that "[m]ost of the students [at the Private School] do not have as much behavioral problems as Student." [Id. at 10.] The Private School had Student's parents hire a board-certified behavior analyst ("BCBA") to help the school deal with his behavior. The BCBA did not testify at the due process hearing. The Private School has a Functional Behavioral Assessment/Behavioral Support Plan ("FBA/BSP") for Student that was created by the BCBA. The Private School does not keep data regarding Student's behaviors. The Private School Principal testified that she spoke often with Student's BCBA and that the BCBA provided on-going training to other Private School staff who worked with Student. [Id.]

At the Private School, Student would throw heavy and sharp objects, "wreck" a game if he was losing, had to be restrained, knocked over desks, kicked things, kicked his teacher, damaged property, and would sometimes lie on the floor to avoid work. [Id. at 11.] Student would scare the other students and, although he always had a 1:1 aide, sometimes he needed two aides. At the time of the Decision, Student left the Private School after lunch every day because that was all he could handle. The Private School Principal testified that Student was "okay with preferred activities, but . . . not okay

11

with non-preferred activities." [Id.] According to Mother, when the Private School started trying to use applied behavioral analysis techniques, Student had to be restrained more. However, the Private School Principal testified that Student's behavior had improved within the last two months prior to the hearing. [Id.] According to the Private School Principal, in late July or early August 2015, she spoke to a DOE office worker – whom the Private School Principal could not identify – who said Student had behavioral problems in the Home School. The Private School Principal testified that this was contrary to the Home School's reports. [Id.] Mother admitted that the Private School struggled with Student's behaviors and that sometimes the school had to isolate him. [Id. at 11-12.]

**IV.   Relevant Assessments**

     **A.   Tyson Report**

Mother asked the DOE in August and September 2013 to perform a comprehensive assessment of Student. The DOE did so around that time, but the Hearings Officer noted that there was no evidence of a more recent comprehensive assessment. Mother later asked private psychologist Karen Tyson, Psy.D., to perform the assessment. [Id. at 7.] Dr. Tyson assessed Student in March and April 2015 and prepared a Neuropsychological Evaluation dated June 1, 2015 ("Tyson Report"). Relying heavily on the observations of Student's parents, Dr. Tyson "diagnosed Student

with ASD, without intellectual impairment, without language impairment requiring level 1 support," and made recommendations, including "a structured academic environment, social skills groups, consistent routine, reminders, extended time, monitored emotions, and re-evaluation." [Id. (citing AR, Respondent's Exh. 18 at 185-86).]  Dr. Tyson acknowledged that, while Mother's autism spectrum rating scales strongly supported a diagnosis of ASD, the 2014-15 SPED Teacher's reports were inconsistent with Mother's ratings.  The Hearings Officer acknowledged that Dr. Tyson did not testify at the due process hearing and that the IEP team did not have the Tyson Report when it formulated the 5/18/15 IEP.  [Id. at 7-8.]

After Mother received the Tyson Report, she requested an IEP team meeting to discuss it.  A meeting was held, but the IEP team did not discuss all of the Tyson Report, and the DOE declined to change the 5/18/15 IEP.  The DOE issued a June 16, 2015 prior written notice ("6/16/15 PWN") which stated that the DOE would conduct an observation but, although the DOE considered the issue, it determined that an adaptive behavior assessment was not necessary because Student was "'independent in self-care skills.'"  [Id. at 17 (quoting AR, Respondent's Exh. 2, at 31).] Mother testified that she wanted the adaptive behavior assessment because of Student's past social and behavioral problems.  At some point thereafter, Mother asked for another IEP team meeting

13

because she felt Student needed additional supports.  A meeting was held on December 10, 2015.  Mother testified that Student was scheduled to return to the Home School on January 6, 2016.  [Id. at 17-18.]

### B.   Dr. Royston's Testimony

Dr. Royston testified at the due process hearing as an expert in clinical psychology and school psychology.  Dr. Royston was one of the co-signors on Student's October 22, 2013 Adaptive and Emotional/Behavioral Assessment, which found that Student met the criteria for ADHD, with a predominantly hyperactive/impulsive presentation, mild to moderate severity.  At the time of this assessment, Student was three years and ten months old, and he exhibited behaviors that were not consistent with an ASD diagnosis.  However, Dr. Royston acknowledged that Student's autism test results may have been skewed by the fact that he was given a version of the test that was not age-appropriate. Dr. Royston testified that, ultimately, the diagnosis does not matter as much as the child's skill levels and observed behaviors that impact his education.  Prior to the due process hearing, Dr. Royston reviewed Student's records, including the Tyson Report.  According to Dr. Royston, Dr. Tyson ignored the fact that the inconsistency between Mother's ratings and the 2014-15 SPED Teacher's reports may have indicated that Student behaved differently at home than he did at school.  [Id. at 8-9.]

14

Dr. Royston observed Student at the Private School on October 2 and 28, 2015.  However, because of the other students' privacy, Dr. Royston had to conduct the observations through cameras and a tablet.  Dr. Royston "opined that, based on Student's destructive conduct, the [Private School] was a harmful environment and not appropriate for Student."  [Id. at 9.]

### C.   Other Testimony and Reports

Student started working with private psychologist Janet Fitzgerald, Psy.D., in late August 2015.  According to Dr. Fitzgerald, Student is "a high-functioning child with autism," and Student is "a perfectionist" with "an intense negativity."  [Id. at 12.]  This leads to self-esteem problems, undesired behaviors, and refusal to do things that he is afraid he will fail at.  Dr. Fitzgerald endorsed Dr. Tyson's recommendations, and Dr. Fitzgerald testified that Student's emotional and social issues impair his academic progress.  [Id. (citing AR, Petitioners' Exh. 1, at page 78).]  Student's primary care physician – who Student began seeing in January 2015 – did not testify at the due process hearing, but submitted a November 3, 2015 letter supporting Dr. Tyson's diagnoses and recommendations.  [Id. (citing AR, Petitioners' Exh. 1, at page 68).]

15

## V.   **The Decision**

Petitioners filed their Complaint before the State of Hawai`i Office of Administrative Hearings, Department of Commerce and Consumer Affairs ("Due Process Complaint"), on July 24, 2015. [AR at 2-8.]  The Hearings Officer summarized the issues raised in the Due Process Complaint as follows:

> A.   Whether the DOE failed to complete and consider needed assessments, and whether Student needed a behavioral evaluation;
>
> B.   Whether the DOE denied Student a FAPE by failing to provide Student with ESY services; whether the IEP team failed to discuss/consider ESY eligibility appropriately; and whether Student was placed in the (least restrictive environment) during summer 2015 ESY;
>
> C.   Whether Student's May 18, 2015 IEP denied Student a FAPE by failing to offer Student appropriate special education services, or supplemental aids or modification to address Student's needs, including Student's social deficits; and
>
> D.   Whether Student's May 18, 2015 IEP denied Student a FAPE by failing to allow parents meaningful participation.

[Decision at 18-19.]  Petitioners requested, *inter alia*, payment/reimbursement for Student's educational services at the Private School, and other related services.  Thus, the appropriateness of the placement at the Private School was also at issue.  [Id. at 19.]

The Hearings Officer concluded that Petitioners' claim that the DOE failed to conduct necessary assessments required

16

consideration of the IDEA's "Child Find" provision, 20 U.S.C.
§ 1412(a)(3)(A).  [Id.]  The Hearings Officer found that the DOE
failed to conduct necessary behavioral assessments, and concluded
that the 5/18/15 IEP failed to offer Student a FAPE.  [Id. at
22.]  Based on the same analysis as the Child Find issue, the
Hearings Officer concluded that, because the 5/18/15 IEP failed
to provide for the necessary evaluation of Student's behavioral,
social, and emotional deficits, the IEP failed to offer Student a
FAPE because it did not include the services, supplemental aides,
program modifications, goals, and objectives that were
appropriate in light of his need in those areas.  [Id. at 25-29.]
However, the Hearings Officer rejected Petitioners' argument that
the 5/18/15 IEP should have provided Student with more than 300
minutes per week of special education.  The Hearings Officer
concluded that this amount was appropriate in light of Student's
intelligence, level of functioning, and abilities.  [Id. at 29.]

        The Hearings Officer concluded that the IEP team did
not deny Student a FAPE when it decided that he was not eligible
for ESY services during the summer of 2015.  [Id. at 22-24.]  The
Hearings Officer also rejected Petitioners' argument that
Student's parents were denied meaningful participation in the
formulation of the 5/18/15 IEP.  [Id. at 30.]

        Finally, the Hearings Officer concluded that Student's
placement at the Private School was appropriate and awarded

Petitioners payment/reimbursement of Student's educational and related services at the Private School from August 24, 2015 to Student's return to the Home School in January 2016. [Id. at 32-33.]

## VI.   **The Instant Case**

This appeal followed.  The DOE filed its Complaint on March 9, 2016.  The DOE alleges that: 1) the Hearings Officer did not have jurisdiction over the Child Find issue because Petitioners did not raise it in the Due Process Complaint; 2) even if the Hearings Officer properly considered the issue, the DOE has satisfied its Child Find obligations in this case; 3) the Hearings Officer erred when he concluded that the DOE's failure to address Student's behavioral and social issues denied Student a FAPE because the Hearings Officer failed to evaluate the 5/18/15 IEP based on the information that was available at the time the IEP was created; 4) the DOE was not required to conduct a behavioral assessment in this case because Student's behavioral problems at home were not affecting his educational progress at the Home School; and 5) even if this Court affirms the Hearings Officer's conclusion that the 5/18/15 IEP failed to offer Student a FAPE, it should vacate the award of reimbursement because the Private School is not an appropriate placement for reimbursement purposes.

Petitioners filed an Answer and Counterclaim on April 8, 2016, and the DOE filed an answer to the Counterclaim on April 15, 2016.  [Dkt. nos. 8, 9.]  Petitioners' Counterclaim alleges, in pertinent part:

> The hearings officer found that Defendants did not show that the May 18, 2015 IEP inappropriately denied Student ESY services; failed to discuss/consider ESY eligibility appropriately; failed to offer Student appropriate special education services, as the 300 minutes per week of special education services offered were sufficient, and failed to allow parent meaningful participation in the development of Student's IEP. These findings and or conclusions were in error and Defendant's [sic] were aggrieved by same.

[Answer and Counterclaim at ¶ 9.]  Because this Court construes the DOE's Complaint as a notice of appeal, see I.T. ex rel. Renee T. v. Dep't of Educ., Civil No. 11-00676 LEK-KSC, 2013 WL 3872787, at *2 (D. Hawai`i July 24, 2013), it construes Petitioners' Counterclaim as a notice of cross-appeal.

**STANDARD**

This Court has examined what constitutes a FAPE, and what is required in reviewing an administrative decision under the IDEA:

> The IDEA defines FAPE as:
>
> special education and related services that –
>
> (A)  have been provided at public expense, under public supervision and direction, and without charge;
>
> (B)  meet the standards of the State educational agency;

19

(C)   include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D)   are provided in conformity with the individualized education program required under section 1414(d) of this title.

[20 U.S.C.] § 1401(9).  To provide FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education, and formulate and implement an IEP.   See generally 20 U.S.C. § 1414.

The standard for district court review of an administrative decision under the IDEA is set forth in 20 U.S.C. § 1415(i)(2)(c), which provides:

In any action brought under this paragraph, the court –

(i)   shall receive the records of the administrative proceedings;

(ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

This standard requires that "due weight" be given to the administrative proceedings.  L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 908 (9th Cir. 2009) (some citations omitted) (quoting Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)).[6]  The amount of deference accorded is subject to the court's discretion.  J.W. [ex rel. J.E.W. v. Fresno

---

[6] Rowley was superseded by statute on other grounds, as recognized in N.B. v. Hellgate Elementary School District, 541 F.3d 1202, 1213 n.3 (9th Cir. 2008).

Unified Sch. Dist.], 626 F.3d [431,] 438 [(9th
Cir. 2010)] (citation omitted).  In reaching that
determination, the court should consider the
thoroughness of the hearings officer's findings,
increasing the degree of deference where said
findings are "thorough and careful."  L.M., 556
F.3d at 908 (quoting Capistrano Unified Sch. Dist.
v. Wartenberg ex rel. Wartenberg, 59 F.3d 884, 892
(9th Cir. 1995)).  "Substantial weight" should be
given to the hearings officer's decision when it
"evinces his careful, impartial consideration of
all the evidence and demonstrates his sensitivity
to the complexity of the issues presented."  Cnty.
of San Diego v. Cal. Special Educ. Hearing Office,
93 F.3d 1458, 1466-67 (9th Cir. 1996) (citation
and quotation marks omitted)) [sic].  Such
deference is appropriate because, "if the district
court tried the case anew, the work of the
hearings officer would not receive 'due weight,'
and would be largely wasted."  Wartenberg, 59 F.3d
at 891.

N.B. v. Hawai`i, Civil No. 13-00439 LEK-BMK, 2014 WL 3663452, at

*2-3 (D. Hawai`i July 21, 2014) (some alterations in N.B.).  The

Ninth Circuit has stated:

> When analyzing whether an agency provided a
> student a FAPE, we conduct a two-part inquiry.
> First, we consider whether "the State complied
> with the procedures set forth in the Act."
> Amanda J. [ex rel. Annette J. v. Clark Cty. Sch.
> Dist.], 267 F.3d [877,] 890 [(9th Cir. 2001)]
> (quoting [Bd. of Educ. v.] Rowley, 458 U.S. [176,]
> 206-07, 102 S. Ct. 3034) (internal quotation marks
> omitted).  Second, we must determine whether the
> IEP is "rationally calculated to enable the child
> to receive educational benefits."  Id.  A state
> must meet both requirements to comply with the
> obligations of the IDEA.  Rowley, 458 U.S. at 207,
> 102 S. Ct. 3034.
>
>     Harmless procedural errors do not constitute
> a denial of FAPE.  L.M. v. Capistrano Unified Sch.
> Dist., 556 F.3d 900, 910 (9th Cir. 2008).
> "'However, procedural inadequacies that result in
> the loss of educational opportunity, or seriously

infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of FAPE.'" Shapiro [ex rel. Shapiro v. Paradise Valley Unified Sch. Dist.], 317 F.3d [1072,] 1079 [(9th Cir. 2003)] (quoting W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23, 960 F.2d 1479, 1484 (9th Cir. 1992)).[7]  Where a court identifies a procedural violation that denied a student a FAPE, the court need not address the second prong.  Id.

Doug C. v. Haw. Dep't of Educ., 720 F.3d 1038, 1043 (9th Cir. 2013) (footnote omitted).[8]  As to the second part of the inquiry, the Ninth Circuit has stated:

> The School District must offer the Student a placement that is tailored to the Student's unique needs.  See Gregory K. [v. Longview Sch. Dist.],

---

[7] Shapiro and W.G. were superseded by statute on other grounds, as recognized in M.L. v. Federal Way School District, 394 F.3d 634, 653 (9th Cir. 2005).

[8] The Ninth Circuit noted:

> Hawaii has fully implemented the purposes, guarantees, and protections of the IDEA into its own regulatory structure.  See Haw. Code R. §§ 8-60-1 to 8-60-84; see also § 8-60-1(b) ("This chapter shall be construed as supplemental to, and in the context of, the Individuals with Disabilities Education Act . . . and other federal laws and regulations relating to the provision of a free appropriate public education to a student with a disability.").  Hawaii's regulations mirror the language in the IDEA regarding the IDEA's purposes, the guarantee of a FAPE, and the requirement of parent participation.  Compare Haw. [Admin.] R. § 8-60-1 (purposes), with 34 C.F.R. § 300.1 (same); Haw. [Admin.] R. § 8-60-3 (guarantee of FAPE), with 34 C.F.R. § 300.101 (same); Haw. [Admin.] R. § 8-60-46 (parent participation), with 34 C.F.R. § 300.322 (same).

Doug C., 720 F.3d at 1043 n.4 (alterations in Doug C.).

> 811 F.2d [1307,] 1314 [(9th Cir. 1987)].
> Additionally, the placement must be in the least
> restrictive environment — in other words, the
> Student must be placed with non-disabled peers "to
> the maximum extent appropriate." 34 C.F.R.
> § 300.114; 20 U.S.C. § 1412(a)(5)(A). . . .

A.R. ex rel. Reese v. Santa Monica Malibu Sch. Dist., 636 F.

App'x 385, 386 (9th Cir. 2016).

> The burden of proof in IDEA appeal
> proceedings is on the party challenging the
> administrative ruling. Hood v. Encinitas Union
> Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007)
> (citations omitted). The challenging party must
> show, by a preponderance of the evidence, that the
> hearing decision should be reversed. J.W., 626
> F.3d at 438 (citation omitted).

N.B. v. Hawai`i, 2014 WL 3663452, at *3. "However, the ultimate

determination of whether an IEP was appropriate is reviewed *de*

*novo*." A.M. ex rel. Marshall v. Monrovia Unified Sch. Dist., 627

F.3d 773, 778 (9th Cir. 2010) (citing Wartenberg, 59 F.3d at

891).

**DISCUSSION**

I.  **Preliminary Issues**

   A.  **Scope of Review**

      At the outset, this Court must address the DOE's

argument that it should disregard Petitioners' cross-appeal

because they failed to file a timely opening brief in support of

the cross-appeal. On May 9, 2016, the magistrate judge issued

the following briefing deadlines: "Opening Brief" – July 8, 2016;

"Opposition" – August 8, 2016; and "Reply" – August 23, 2016.

[Minutes, filed 5/9/16 (dkt. no. 12).]  Although not expressly stated in the magistrate judge's minutes, insofar as the magistrate judge did not give separate deadlines for the DOE's appeal and Petitioners' cross-appeal, the deadlines for both were the same.  The DOE's opening brief in support of their appeal and Petitioners' opening brief in support of their cross-appeal were both due by July 8, 2016.

Petitioners did not file an opening brief in support of their cross-appeal.  Instead, they presented arguments in support of their cross-appeal within their Answering Brief, which they filed on August 8, 2016.  To the extent that Petitioners' Answering Brief also purports to be their opening brief in support of their cross-appeal, Petitioners' "opening brief" was untimely.  Although it is within this Court's discretion to strike Petitioners' "opening brief," in the interests of justice, this Court will consider it.  <u>Accord</u> Minutes, filed 10/12/16 (dkt. no. 25) (concluding that a brief continuance of the oral argument because of the late transmittal of the administrative record was in the interests of justice).

However, this Court will not consider Petitioners' argument that Student requires certain aids, services, and/or modifications that were not included in the 5/18/15 IEP.  <u>See</u> Answering Brief at 7–9.  Petitioners' Due Process Complaint did argue:

24

> Student needed the all [sic] or any of the
> following supplemental aids and/or services and/or
> modifications to this program, but did not get
> them in his IEP:
>
> structured socialization opportunities; parent
> training; structured classroom environment; short
> instructional periods with breaks; transition
> supports; visual schedule; assistive technology fo
> communication; FBA/BSP; Extra time for assignments
> regarding in-class and/or homework; check for
> understanding; repeat instructions; modified
> testing environment; preferential seating;
> chucking [sic] of assignments; multi-modality
> instruction.

[AR at 4.]  But, Petitioners' Counterclaim/cross-appeal did not

address this issue.  See Counterclaim at ¶ 9 (challenging the

Hearings Officer's ruling that they did not show that the 5/18/15

IEP "failed to offer Student appropriate special education

services, as the 300 minutes per week of special education

services offered were sufficient").  Thus, as to the specific

services, supports, aids, and modifications contained in the

5/18/15 IEP, the only issue properly before this Court in the

cross-appeal is Petitioners' challenge to the amount of weekly

special education services.  This Court expresses no opinion

regarding the other items mentioned in that portion of Due

Process Complaint.

    **B.**   **Level of Deference**

    This Court has considered the Decision as a whole and

FINDS that there are portions of the Decision that do not

"evince[ a] careful, impartial consideration of all the evidence"

and do not "demonstrate[ a] sensitivity to the complexity of the issues presented." See Cty. of San Diego, 93 F.3d at 1466.  In particular, the Decision includes legal errors in the Child Find analysis, and the Decision's analysis of the need for a behavioral reevaluation glosses over considerable factual testimony that contradicts the Hearings Officer's findings, without a sufficient explanation.  These are significant factors that undermine the Court's confidence in the administrative findings in those sections of the Decision.  The Court therefore gives minimal deference to those sections of the Decision.  See Ashland Sch. Dist. v. Parents of Student R.J., 588 F.3d 1004, 1009 (9th Cir. 2009) ("The court is free to determine independently how much weight to give the state hearing officer's determinations." (citations omitted)).  However, this Court has recognized that:

> Where a decision contains some findings that are "thorough and careful," and others that are not, however, the court can give deference to the thorough and careful findings independently.  See R.B., ex rel. F.B. v. Napa Valley Unified School Dist., 496 F.3d 932, 943 (9th Cir. 2007) ("[W]e accord particular deference to the [hearings officer's] 'thorough and careful' findings . . . although we independently review the testimony in the record that [he] failed to consider.").  Accordingly, the Court finds that the Hearings Officer's findings and conclusions are entitled to increased deference, with some exceptions noted below.  See L.M., 556 F.3d at 908. . . .

Dep't of Educ., Hawaii v. Z.Y. ex rel. R.Y., Civil No. 13-00322 LEK-RLP, 2013 WL 6210637, at *9 (D. Hawai`i Nov. 27, 2013) (some

alterations in Z.Y.).  With the exception of the two portions of

the Decision noted *supra*, the Decision is thorough and careful,

and this Court gives increased deference to the remainder of the

Decision.

This Court now turns to the merits of the appeals

before it.

## II.  **Child Find**

The Hearings Officer stated that Petitioners'

allegation that the DOE failed to conduct necessary behavioral

evaluations required consideration of the IDEA's Child Find

provisions.  [Decision at 19.]  The DOE argues that the Hearings

Officer erred in addressing the Child Find issue because

Petitioners did not raise it in their Due Process Complaint, *i.e.*

they did not exhaust their administrative remedies at to that

issue.  This Court has stated:

> As a general rule, arguments not raised at an
> administrative hearing cannot be raised for the
> first time on appeal to the district court.  The
> Ninth Circuit applied this rule to IDEA appeals in
> Robb v. Bethel School District No. 403, where it
> held that, "when a plaintiff has alleged injuries
> that could be redressed to any degree by the
> IDEA's administrative procedures and remedies,
> exhaustion of those remedies is required."  308
> F.3d 1047, 1048 (9th Cir. 2002).[9]  Exhaustion

---

[9] Robb was overruled by Payne v. Peninsula School District,
653 F.3d 863 (9th Cir. 2011), which was overruled on other
grounds by Albino v. Baca, 747 F.3d 1162 (9th Cir. 2014).
However, in Payne the Ninth Circuit merely "'clarified that the
IDEA's exhaustion provision applies only in cases where the
(continued...)

may be avoided, however, if "it would be futile or offer inadequate relief, or if the agency has adopted a policy or pursued a practice of general applicability that is contrary to the law." <u>N.D. v. Hawaii Dep't of Educ.</u>, 600 F.3d 1104, 1110 (9th Cir. 2010) (citations and internal quotation marks omitted).  None of these exceptions apply in this case.

The Ninth Circuit has also held that review in IDEA cases is specifically limited to the issues raised in the administrative complaint. <u>Cnty. of San Diego v. Cal. Special Educ. Hearing Office</u>, 93 F.3d 1458, 1465 (9th Cir. 1996) ("The scope of the administrative hearing mandated by [former] section 1415(b)(2) is limited to the 'complaint' raised to obtain the hearing.").  20 U.S.C. § 1415 codified this holding, providing that "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice filed under subsection (b)(7), unless the other party agrees otherwise." § 1415(f)(3)(B).

<u>James M. ex rel. Sherry M. v. Hawai`i</u>, 803 F. Supp. 2d 1150, 1164–65 (D. Haw. 2011) (alterations in <u>James M.</u>) (footnote omitted); <u>see also</u> <u>J.W.</u>, 626 F.3d at 451 ("This Court lacks subject matter jurisdiction over claims Student failed to raise in the relevant administrative procedure.").

In the instant case, Petitioners' Due Process Complaint did not argue that the DOE violated its Child Find obligations. <u>See</u> AR at 2–8.  In addition, there is no evidence in the record that the parties agreed that scope of the due process hearing

_____

[9](...continued)
relief sought is available under the IDEA.'" <u>M.M. v. Lafayette Sch. Dist.</u>, 767 F.3d 842, 861 (9th Cir. 2014) (quoting <u>Payne</u>, 653 F.3d at 871).

would include a Child Find violation, in spite of the lack of such an allegation in the Due Process Complaint.  The Hearings Officer's review was limited to the issues raised in the Due Process Complaint, and therefore the Hearings Officer erred in addressing the Child Find issue.  Because Petitioners failed to raise the Child Find issue in the administrative proceedings, this Court CONCLUDES that the Hearings Officer lacked jurisdiction over the Child Find issue.

    For the sake of completeness, even if Petitioners' Due Process Complaint could be construed as raising a Child Find argument, this Court would reject it on the merits.  The IDEA "Child Find" obligation is set forth in 20 U.S.C. § 1412(a)(3)(A), which states:

> All children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

See also 34 C.F.R. § 300.111(a)(1), (c)(1).  The Ninth Circuit has stated: "Child-find requires school districts to develop a method to identify, locate, and evaluate students with disabilities who are in need of special education services."

Beauchamp v. Anaheim Union High Sch. Dist., 816 F.3d 1216, 1221

(9th Cir. 2016) (citing 20 U.S.C. § 1412(a)(3)(A)).

      Haw. Admin. R. § 8-60-10 contains a similar

requirement.  It states, in pertinent part:

> (a)  General.  The department shall annually
> identify, **locate**, and evaluate, all students with
> disabilities residing in the State, including
> students with disabilities who are homeless
> students or are wards of the State, and students
> with disabilities attending private schools,
> regardless of the severity of their disability,
> and who are in need of special education and
> related services.
>
> . . . .
>
> (d)  Referral.
>
> > (1)  All referrals for the evaluation of a
> > student to determine **eligibility** as a student
> > with a disability under this chapter shall be
> > documented and shall be in accordance with
> > this section[.]

§ 8-60-10 (emphases added).

      This district court has stated that "the child-find

duty is triggered when the state or [local educational agency]

has reason to suspect a disability, and reason to suspect that

special education services may be needed to address that

disability." Dep't of Educ., State of Haw. v. Cari Rae S., 158

F. Supp. 2d 1190, 1194 (D. Hawai`i 2001) (internal quotation

marks and some alterations omitted).  However, the Ninth Circuit

has neither adopted this test nor articulated its own.  See G.M.

<u>ex rel. G.M. v. Saddleback Valley Unified Sch. Dist.</u>, 583 F. App'x 702, 704 n.1 (9th Cir. 2014) (discussing <u>Cari Rae S.</u>).

This district court has also rejected the argument that the DOE's child-find obligation extends to the recognition of additional disabilities in a student who is already receiving special education services.

> [The mother] argues that DOE should have known about [the student]'s mental status.  She points to 20 U.S.C. § 1412 and <u>Department of Education, State of Hawaii v. Cari Rae S.</u>, 158 F. Supp. 2d 1190 (D. Haw. 2001), for the proposition that the DOE has an independent obligation to evaluate its students.  This argument is without merit.  The "Child Find" provision of § 1412 (which provides in relevant part that "[a]ll children with disabilities residing in the State, . . . and who are in need of special education and related services, are identified, located, and evaluated") requires the DOE to identify and evaluate those students with disabilities, and <u>Cari Rae S.</u> affirms the basic principle that the DOE has an affirmative obligation to identify and evaluate these students.  [The student] has already been identified and evaluated as a special education student, however, and neither § 1412 nor <u>Cari Rae S.</u> requires anything more from the DOE.

<u>B.V. v. Dep't of Educ., State of Haw.</u>, 451 F. Supp. 2d 1113, 1128 n.23 (D. Hawai`i 2005), *aff'd sub nom.* 514 F.3d 1384 (9th Cir. 2008).  This Court agrees with the reasoning in <u>B.V.</u> and, for the same reasons, concludes that Petitioners' allegation that the DOE failed to conduct necessary behavioral assessments does not allege a violation of the DOE's Child Find obligations.

Thus, because of Petitioners' failure to raise the Child Find argument in their Due Process Complaint, this Court

GRANTS the DOE's appeal as to the Child Find issue and VACATES the Hearings Officer's Decision as to that issue.

## III. <u>Failure to Perform Behavioral Assessment</u>

Apart from the purported Child Find violation, the Hearings Officer concluded that the 5/18/15 IEP failed to offer Student a FAPE because: 1) the DOE should have conducted a behavioral assessment prior to the development of the 5/18/15 IEP; and 2) because of the lack of a behavioral assessment, the IEP does not address Student's behavioral, social, and emotional needs.  The DOE argues that these findings were erroneous and should be reversed.

This Court's analysis begins with the issue of whether the DOE violated the IDEA by failing to reevaluate Student's behavioral needs.  Section 1414 states, in pertinent part:

> (a)  Evaluations, parental consent, and reevaluations
>
> . . . .
>
> (2)  Reevaluations
>
> (A)  In general
>
> A local educational agency shall ensure that a reevaluation of each child with a disability is conducted in accordance with subsections (b) and (c)—
>
> (i)  if the local educational agency determines that the educational or related services needs, including improved academic achievement

and functional performance, of
the child warrant a
reevaluation; or

(ii) if the child's parents or
teacher requests a reevaluation.

. . . .

(b)   Evaluation procedures

. . . .

(3)   Additional requirements

Each local educational agency shall ensure
that—

. . . .

(B)   the child is assessed in all areas
of suspected disability[.]

20 U.S.C. § 1414(a), (b).  Pursuant to § 1414(a)(2)(A)(ii), the

DOE was required to conduct a reevaluation of Student's

behavioral needs because Mother requested a reevaluation.

However, at both the May 18, 2015 IEP team meeting and the June

2015 meeting to discuss the Tyson Report, the DOE determined that

a reevaluation was not necessary.

The failure to conduct a reevaluation to ensure that a

student has been assessed in all areas of suspected disability

can constitute a procedural denial of FAPE.  Aaron P. v. Dep't of

Educ., Hawaii, Civil. No. 10-00574 LEK-KSC, 2011 WL 5320994, at

*27 (D. Hawai`i Oct. 31, 2011).  The DOE's failure to conduct a

behavioral reevaluation upon Mother's request was a procedural

33

violation of the IDEA.  The issue before this Court is whether the procedural violation resulted in a denial of FAPE.

Although not expressly stated in the Decision, the Hearings Officer effectively concluded that the procedural violation: 1) affected Student's substantive rights – resulting in a denial of FAPE – because the failure to conduct necessary behavioral assessments resulted in the failure to offer him the services and supports that his behavioral needs required; and 2) did not affect Mother's substantive rights because there was no infringement upon Mother's opportunity to participate in the IEP development process.  The DOE's appeal challenges the first ruling, and Petitioners' cross-appeal challenges the second.

> A.  **Student's Substantive Rights**

The Hearings Officer found that a behavioral assessment – *i.e.*, a reevaluation of Student's behavioral needs – was necessary because Student had social and behavioral issues that raised concerns when the team developed the 5/18/15 IEP.  In making this finding, the Hearings Officer relied upon: the PLEPs and the BSP included in Student's IEPs for the 2013-14 school year; the behavioral and social goals in the 10/21/14 IEP; Mother's testimony about Student's behavior during the 2014-15 school year; Mother's testimony and the Private School Principal's testimony about Student's behavioral issues at the Private School; and the Tyson Report.  [Decision at 19-22.]

1.   **Snapshot Rule**

First, an IEP must be evaluated in light of the "snapshot" rule, "which instructs us to judge an IEP not in hindsight, but instead based on the information that was reasonably available to the parties at the time of the IEP." See Baquerizo v. Garden Grove Unified Sch. Dist., 826 F.3d 1179, 1187 (9th Cir. 2016).[10]  The snapshot rule "is not retrospective." J.W., 626 F.3d at 439.

> Instead of asking whether the [IEP] was adequate in light of the [Student's] progress, the district court should have asked the more pertinent question of whether the [IEP] was appropriately designed and implemented so as to convey [Student] with a meaningful benefit.  We do not judge an [IEP] in hindsight; rather, we look to the [IEP's] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer [Student] with a meaningful benefit . . .  In striving for "appropriateness," an IEP must take into account what was, and what was not, objectively reasonable when the snapshot was taken, that is at the time the IEP was drafted.

Id. (alterations in J.W.) (citation omitted).

---

[10] Baquerizo stated that the Ninth Circuit employs the snapshot rule in evaluating whether a proposed educational placement is appropriate.  826 F.3d at 1179.  However, the snapshot rule is not limited to challenges to placement.  See, e.g., L.J. v. Pittsburg Unified Sch. Dist., 835 F.3d 1168, 1175 (9th Cir. 2016) (applying the snapshot rule to a review of the "appropriateness of a student's eligibility"); B.M. ex rel. R.M. v. Encinitas Union Sch. Dist., Civil No. 08cv412-L(JMA), 2013 WL 593417, at *6 (S.D. Cal. Feb. 14, 2013) ("Based on the 'snapshot' rule, it was not error for the ALJ, to find the postIEP [sic] assessments and testimony of plaintiff's experts to be irrelevant in determining whether the IEP offer of services and placement for plaintiff . . . was appropriate.").

Thus, pursuant to the snapshot rule, this Court CONCLUDES that the Hearings Officer erred in considering Student's behavioral issues at the Private School because that information was not reasonably available to the IEP team when it developed the 5/18/15 IEP.  Although the IEP team did not have the Tyson Report at the time it developed the 5/18/15 IEP, the team reconvened in June 2015 to discuss the Tyson Report and had the opportunity to make adjustments to the IEP, but ultimately decided not to make any changes.  Because the IEP team received the Tyson Report and had the opportunity to decide whether to make changes the 5/18/15 IEP in light of the report, this Court FINDS that the Tyson Report is part of the snapshot of information that was reasonably available to the IEP team.

### 2. **Evidence Properly Before the Hearings Officer**

The Hearings Officer stated:

During th[e 2013-2014] school year, Student exhibited behavioral issues, as evidenced by the PLEPs, and the fact that the 2013-2014 special education teacher had developed a BSP for Student. Student's January 14, 2014 and April 4, 2014 IEPs provided Student with a BSP.

Although the subsequent IEPs show that a BSP was not listed as a supplemental aid and support, under the statutory language listed above, the DOE has the duty to evaluate all students with disabilities, regardless of the severity of their disability.

[Decision at 19-20.]  The Hearings Officer also noted that "the PLEPs in the January 14, 2014 and April 4, 2014 IEPs, written by

36

the DOE, show that Student had social and behavioral issues."
[Id. at 20.]  The Hearings Officer also relied upon: Mother's
testimony about Student's behavioral and social problems during
the 2014-2015 school year, which the Hearings Officer found were
confirmed by the Tyson Report, the PLEPs in the 5/22/14 IEP, and
the Parent Concerns section in the 5/22/14 IEP; [id. at 21-22;]
and the fact that the behavioral and social goals in the 10/21/14
IEP "show[] that behaviors and social skills were areas of
concern," [id. at 22].  Thus, the Hearings Officer concluded
that, because the DOE had a duty "to annually evaluate all
students with disabilities, regardless of the severity of their
disability," the DOE's "fail[ure] to conduct needed behavioral
assessments" was "denial of FAPE."  [Id.]

　　　　Although not clearly stated, the Hearings Officer
apparently concluded that, because a behavioral reassessment was
"needed," the DOE's procedural violation in failing to conduct
the requested reevaluation affected Student's substantive rights.
This Court must therefore determine whether the evidence that was
properly before the Hearings Officer supported the finding that a
behavioral assessment was necessary.

　　　　　　　　a.　　BSP

　　　　Although Student's 2013-14 SPED Teacher prepared a BSP
for him, both the 1/14/14 IEP and the 4/4/14 IEP stated that it
was to be used "when appropriate," as opposed to other aids,

services, modifications, and supports which were to be employed "[d]aily." [AR, Respondent's Exh. 6 (1/14/14 IEP) at 74, Exh. 7 (4/4/14 IEP) at 87.] Further, both the 1/14/14 IEP and the 4/4/14 IEP indicated that the BSP was optional, not a requirement. [AR, Respondent's Exh. 6 at 74 (stating that a BSP **"may be developed** with the support of the counselor upon parental consent and classroom observation"); <u>id.</u>, Exh. 7 at 87 (same).]

Further, neither Student's 5/22/14 IEP nor his 10/21/14 IEP included a BSP. [AR, Respondent's Exh. 8 (5/22/14 IEP) at 100, Exh. 9 (10/21/14 IEP) at 115.] The October 27, 2014 PWN that followed the 10/21/14 IEP noted that Parent raised concerns about Student's behavior at home, and Parent requested a BSP. The DOE rejected the request because "[c]urrently [Student] is not displaying any of the behaviors of concern at school." [AR, Respondent's Exh. 9 at 118.] Mother acknowledged that, during the entire 2014-15 school year, Student did not have a BSP. Student's 2014-15 SPED Teacher and the Head Start Teacher told her that a BSP was not necessary because all of the elements in the BSP were provided to all students in the class. [12/16/15 Trans. at 133-34, 193.] Student's 2014-15 SPED Teacher confirmed that the IEP team determined the BSP which the 2013-14 SPED Teacher created was not necessary for the 2014-15 school year. [AR, Trans. of 12/18/15 Proceedings ("12/18/15 Trans.") at 434.] Thus, this Court CONCLUDES that the Hearings Officer erred in

38

finding that the existence of Student's BSP for the 2013-14 school year was evidence that a behavioral reevaluation was necessary at the time the IEP team developed the 5/18/15 IEP.

**b.    PLEPs and Parental Concerns in Prior IEPs**

The adaptive, emotional, and behavioral PLEPs in the 1/14/14 IEP stated:

> Rating scales completed by mother and preschool teacher indicate that [Student]'s performance of the day-to-day activities necessary to take care of himself and get along with others (adaptive behaviors) is well below age expectations. Behavior rating scales also indicated elevated levels of concern compared to other children his age in the areas of inattention/hyperactivity, defiance, social functioning, mood regulation/emotional control, and anxiety at home.
>
> [Student] also has trouble interacting with his peers.  Although he initiates interactions appropriately with adults, he has difficulty transferring these skills to interactions with his peers. . . .

[AR, Respondent's Exh. 6 at 67-68.]  The 4/4/14 IEP had the same PLEPs as the 1/14/14 IEP.  [AR, Respondent's Exh. 7 at 80 (stating that the PLEPs section was "Updated 1/14/14").]

The "Parent input" section of the 1/14/14 IEP stated:

> (12/6/13) [Student] is more introverted.  He likes to be around other children but lacks social skills (e.g., does not know how to approach another child and request play appropriately).  He relates well to adults.  She also notes that he goes through "depressive spells" that can last a week or more. . . .

[AR, Respondent's Exh. 6 at 69.]  The 4/4/14 IEP had an identical note in the "Parent input" section.  [AR, Respondent's Exh. 7 at

82.]  It is undisputed that Student had adaptive/emotional/behavioral issues during the 2013-14 school year.  However, the presence of those issues alone does not prove that a behavioral reevaluation was necessary for the development of the 5/18/15 IEP.

> The PLEPs section of the 5/22/14 IEP stated:
>
> SOCIO-EMOTIONAL SKILLS
> -engages in pretend play for 15 minutes
> -likes to help with classroom jobs
> -relates well with adults
> -follows routines; anticipates next activity
> -curious, explores materials in learning centers
> -immature interactions with peers (baby talks,
>     silliness, making faces, copy-cat behavior)
> -may "sabotage" peer's play (hides toys, dumps
>     blocks where peers are playing)
> -intentionally doesn't clean up/put toys away
> -prefers to play by himself or with an adult
> -pouts, withdraws, seeks alone time
> -sometimes refuses to comply with given directives
> -intentionally acts out to get adult attention
>
> NEEDS:
> -manage his own feelings
> -follow limits and expectations
> -interact successfully with peers
> -improve social problem-solving

[AR, Respondent's Exh. 8 at 92.]  The PLEPs section of the 10/21/14 IEP had the same socio-emotional skills and needs.  [AR, Respondent's Exh. 9 at 107.]

> The "Parent Concerns" section of the 5/22/14 IEP stated:
>
> [Student] likes to be around other children but
> lacks social skills.  He doesn't know how to
> initiate play with another child or how to play
> appropriately.  He relates well to adults.

40

> [Student] goes through "depressive spells" that
> can last a week or more.  He has tantrums at home
> that can include hitting, kicking, whining and
> screaming and has difficulty calming himself down.
> The family is receiving Parent Child Therapy to
> help with behavior issues at home, which has
> helped.  Parent has noticed improvement in his
> behavior and attitude since he began school. . . .

[AR, Respondent's Exh. 8 at 92.]  The "Parent Concerns" section

of the 10/21/14 IEP was identical.  [AR, Respondent's Exh. 9 at

107.]

> The PLEPs section of the 5/18/15 IEP stated:
>
> Social-Emotional:
> -Happy and cheerful child, willing to try new
>     things
> -Seems to be very comfortable in the classroom
> -No separation problem
> -Greets peers and adults
> -Says "please" and "thank you"
> -Curious and eager to explore in the classroom
> -Likes being a helper
> -Manages transition well
> -Uses classroom toys/material carefully and puts
>     toys away
> -Follows classroom rules and routine
> -Tries out a variety of activities
> -Willing to come and participate in activities not
>     of his choosing
> -Learns well in both small/large setting
> -Able to focus and complete tasks
> -Participates actively in large/small group
>     activities such as circle/story/music time
>     and remains focused
> -Gets along well with peers and plays
>     cooperatively
> -Joins group games like Mr. Wolf and London bridge
> -At times shows empathy by caring for friends
> -Starting to show leadership
> -Shares and takes turns most of the time
> -Able to use words to express own feelings

-Participates in second step lessons, learning
about using calm down and problem solving
skills

Needs: None at this time

[AR, Respondent's Exh. 10 at 121-22.]  It also stated:

Mother has expressed concern about [Student's
behavior at home.

Below are the concerns:

Acting out physically
Defiant behavior
Very irritable
Doesn't know what to do with his body and
emotions[.]

[Id. at 122.]

Nothing in the PLEPs or parental concerns sections of
these IEPs shows that Student's behavioral needs required
reevaluation in order to develop the 5/18/15 IEP.  In fact, the
IEPs show that Student was making progress in his adaptive,
social, emotional, and behavioral skills at school, although he
was still experiencing issues at home.

The IDEA and Ninth Circuit case law only required the
DOE to address Student's behavioral issues outside of school if
the issues were affecting his academic progress.  San Rafael
Elem. Sch. Dist. v. Cal. Special Educ. Hearing Office, 482 F.
Supp. 2d 1152, 1161 (N.D. Cal. 2007) ("[N]ot every need of a
particular child is the legal responsibility of the District.").
Similarly, in Noah D. v. Department of Education, this district
court rejected the DOE's argument that the court could not

42

consider the student's educational progress – or lack thereof –
in the home because, in that case, the student's IEP required the
DOE to provide certain in-home services.  Civil No. 12-00459 DKW-
RLP, 2013 WL 5944367, at *2 (D. Hawai`i Nov. 5, 2013) (citing San
Rafael Elem.).

       This Court agrees with the analysis in San Rafael
Elementary, and, having reviewed the relevant IEPs, FINDS that
the IEPs do not show that Student's behavioral issues at home
were affecting his educational progress.  Further, although
Student's IEPs noted that his family was receiving therapy to
address his behavioral issues at home, see, e.g., AR,
Respondent's Exh. 8 (5/22/14 IEP) at 92, there is no indication
that the DOE was providing the therapy as part of his IEPs.  This
Court FINDS that there is no evidence in the record that Student
was receiving special educational services or supports at home.

       This Court therefore CONCLUDES that, because the PLEPs
and parental concerns sections only show continued behavioral
issues at home, those portions of the 5/22/14 IEP, 10/21/14 IEP
and 5/18/15 IEP do not support a finding that a behavioral
reevaluation was necessary to develop the 5/18/15 IEP.

                c.   **Other Information Available at the Meeting**

       The DOE's failure to conduct the requested behavioral
reevaluation would only affect Student's substantive rights if
the other information that was reasonably available to the IEP

                                  43

team when it developed the 5/18/15 IEP established that:

1) Student was experiencing behavioral issues at school that were not reflected in the 5/18/15 IEP; or 2) the behavioral issues that Student was experiencing at home affected his educational progress.

The 5/18/15 IEP identified positive social/emotional behaviors and did not identify any needs.  Mother disagreed.  She testified:

> Q.   Did you see from your perspective the cessation of all social and emotional problems during that one school year, 2014-2015?
>
> A.   No.
>
> Q.   In fact, have his problems gotten worse as far as you can tell over the years?
>
> A.   Yes.

[12/16/15 Trans. at 161.]  Mother noted that the adaptive and emotional/behavioral assessment summary in 4/4/14 IEP stated that: Student's "getting along with others, and his ability to take care of himself, [were] well below age expectations"; and "[i]nattention, hyperactivity, defian[ce], social functioning, mood regulation, emotional control, and anxieties at home" showed "elevated levels of concern compared to other children his age." [Id. at 149-50.]  Mother believed that Student still had these deficits in June 2015.  [Id. at 150.]

First, although it was clear that, at the time of her testimony during the due process hearing, Mother disagreed with

44

the Home School's description of Student's in-school behaviors,
it appears that her primary focus at the May 18, 2015 IEP team
meeting was on his at-home behavior.  As noted, *supra*, the
"Family/Medical" section of the 5/18/15 IEP noted that Mother
expressed concerns about Student's at-home behavior.  [AR,
Respondent's Exh. 10 at 122.]  At the due process hearing, Mother
was asked if that section was the totality of what she told the
team.  She responded: "That's a fair bit.  I do not recall if
there was anything else."  [12/16/15 Trans. at 129; id. at 207
(confirming that she could not recall if she had other concerns
beyond those reflected in the 5/18/15 IEP).]  However, even if
this Court assumes that Mother did assert at the 5/18/15 IEP team
meeting that Student's in-school behaviors were more serious than
what was reflected in the draft of the IEP, the evidence in the
record – including Mother's testimony – does not show either that
Student's in-school behaviors were as problematic as his reported
at-home behaviors or that his in-school behaviors otherwise
warranted a behavioral reevaluation.

When asked whether it was possible that the behaviors
that the Home School teachers saw in May 2015 were different than
what she saw at home, Mother responded that she "never was with
him during the school day," with the exception of a May Day
activity.  [Id. at 176-77.]  Mother testified that there was a
boxcar race in which the children wore cardboard boxes.  Student

needed multiple redirections so that he did not "wander off and do his own thing and play bumper cars and try to crash into other kids." [Id. at 177-78.]  Mother saw Student bump people and she saw multiple redirections.  [Id. at 178.]  Mother admitted that it seemed like the Home School was able to handle the situation with appropriate redirection.  [Id. at 179.]  In addition, there were "several things" that she was at the Home School for during the 2014-15 school year when she "witnessed behaviors at the school." [Id. at 177.]  When asked about whether there were incidents of violence at the Home School, she described two incidents: one in which she saw Student throw sand at another child's face; and an incident report that she received about Student spitting on another child on the school bus.  [Id. at 179-80.]

The Hearings Officer found that the Private School Principal testified that "in late July or early August 2015, she spoke with an unidentified DOE office worker at the home school who noted that Student had behavioral problems at the home school." [Decision at 11.]  However, what the Private School Principal actually testified was: "this woman said oh, you've got him.  And I was like yes, he's kind of a challenge.  Those transitions are difficult.  And she said well, I'm glad someone else sees it." [12/16/15 Trans. at 21.]  The Private School Principal also stated, "it was like, you know, at last someone is

getting on this."  [Id.]  However, it is not clear whether the
"at last someone is getting on this" statement was another
statement by the Home School office worker or merely the Private
School Principal's interpretation of the "I'm glad someone else
sees it" statement.

        Based on testimony by Mother and the 2014-15 SPED
Teacher, the office worker that the Private School Principal
spoke to was a woman named "Lori."  Lori was the mother of some
of the children in the Head Start class and, although she was not
one of the regular helpers in Student's 2014-15 classroom, she
would come to the class on occasion to help.  [12/16/15 Trans. at
155-56; 12/18/15 Trans. at 447.]  Lori did not testify at the due
process hearing.  Because Lori's statement(s) to the Private
School Principal are open to interpretation, she had limited
experience with Student, and she did not testify at the hearing,
the Private School Principal's testimony about Lori's
statement(s) has minimal – if any – probative value.

        Moreover, the record reflects that the Home School
consistently took the position that the problematic behaviors
Mother reported at home did not occur at school during the 2014-
15 school year.  For example:

-The 10/27/14 PWN stated that Student's parents requested a BSP
    and had concerns about at-home behaviors, but the request
    was rejected because Student was "not displaying any of the
    behaviors of concern at school."  [AR, Respondent's Exh. 9
    at 118.]

-Mother testified that she had Student independently assessed[11] because, when she raised concerns about Student's behaviors, emotions, and moods at a team meeting, Dr. Royston said they were not seeing the problems in school. [12/16/15 Trans. at 152.]

-Mother testified that she and the 2014-15 SPED Teacher used a communication book, and when Mother "expressed concerns about behaviors, it was brushed off and [Mother] repeatedly was told [Student] is perfect. We wish we had 20 more of him." [Id. at 129.]

-Mother acknowledged that the 2014-15 SPED Teacher discussed Student's social/emotional needs at the May 18, 2015 IEP team meeting and, according to the teacher: "It was all positive. She said [Student] is good to go. He's great." [Id. at 130.]

The 2014-15 SPED Teacher testified that she collected data about her students throughout the school year. She collected academic, behavioral, social, and emotional data about Student. [12/18/15 Trans. at 425.] As to Student's social skills, the 2014-15 SPED Teacher testified that, "[a]t the beginning of school year [sic], he did do more parallel play. But by mid-year, he was into interacting with his peers and he looked forward to when they arrived." [Id. at 427.] According to the 2014-15 SPED Teacher, by the end of the school year, Student "was at age level for his social skills." [Id. at 426.] He still occasionally engaged in parallel play, but he "like[d] interacting with his peers" and played appropriately with other

---

[11] Mother contacted Dr. Tyson's office in February 2015. [12/16/15 Trans. at 130.]

children.  [Id.]  Based on her interaction with Student, she did
not believe he had any social deficits.  [Id.]

As to Student's behavior and emotions, the 2014-15 SPED
Teacher testified that she did not recall Student hitting other
children, and she did not consider him a danger to other
children.  He did not destroy other children's property or the
Home School's property.  [Id. at 427-48.]  He did not throw
tantrums, and "[h]e was usually very willing to come to do
activities where there would be small group or one-on-one within
academics."  [Id. at 428.]  She did not recall that Student
needed to take breaks.  [Id.]  She testified that there were no
red flags with respect to his classroom behavior.  [Id. at 433.]

The 2014-15 SPED Teacher testified that she attended
the May 18, 2015 IEP team meeting and the "Social-Emotional"
section of the 5/18/15 IEP was developed based on input from
observations in her classroom.  [Id. at 429.]  She confirmed that
Mother told her that, at home, Student "could be defiant and he
would could [sic] be aggressive, and he wouldn't listen, he had
breath-holding episodes, and he has depression."  [Id. at 430.]
However, the 2014-15 SPED Teacher testified that she did not see
any of those behaviors in the classroom.  [Id.]  For example,
during circle time, which could last up to thirty or forty
minutes, the children were expected to sit cross-legged, with
their bodies and eyes oriented to the speaker.  Student "sat

really nicely." [Id. at 431-32.]  Sometimes he wanted to shout

out answers, but he was not the only child who did so.  [Id. at

432.]  The 2014-15 SPED Teacher testified that the IEP team

discussed Student's behaviors and "determined that those were

typical behaviors of a preschool-aged child" and "it wasn't

anything out of the norm that we would see in our classroom."

[Id.]  She characterized his behavior at the time of the May 18,

2015 IEP team meeting as that of "a typical five-year-old."  [Id.

at 430.]

          The 2014-15 SPED Teacher has a Bachelor of Science

degree in speech pathology and audiology and a Master's of

Education degree in special education.  She has a certification

to teach special education and early childhood education.  At the

time of the due process hearing, she had been employed with the

DOE for twenty-four years, all of them at the Home School.  The

last twenty-two of those years were as a special education

teacher in an inclusion classroom.  [12/18/15 Trans. at 415-17.]

The 2014-15 SPED Teacher is clearly qualified, and the Hearings

Officer never made a finding that she was not credible.

          Dr. Royston recognized that "[t]here are times that

teachers sugarcoat and don't see."  [12/17/15 Trans. at 360.]

However, Mother's limited observations of Student's in-school

behavior and the vague statement(s) by "Lori" do not prove that

the 2014-15 SPED Teacher's consistent descriptions of Student's

in-school behavior were sugarcoated or that the teacher did not see problematic behavior.  Thus, even if the Hearings Officer made an implicit finding that the 2014-15 SPED Teacher's testimony regarding Student's in-school behavior, social skills, and emotions was not credible, the adverse credibility finding is not supported by the record.

The relevant section of the Decision contains minimal discussion of the 2014-15 SPED Teacher's observations and testimony.  See Decision at 20 ("Respondent argues that Student was not exhibiting behaviors at school and cites the special education teacher's testimony that Student did not exhibit behavioral problems at school while the May 18, 2015 IEP was being developed.").  The Hearings Officer disregarded the 2014-15 SPED Teacher's testimony and credited Mother's testimony that "Student's behavior was worse during the 2014-2015 school year." [Id. at 21.]  However, what Mother actually testified to was that Student's problems had "gotten worse . . . over the years." [12/16/15 Trans. at 161.]  Mother acknowledged that she was "not with him every single day at school" during the 2014-15 school year, and that the concerns she expressed at the May 18, 2015 IEP team meeting were based on what she would see at home.  [Id. at 207.]  She admitted: "It is hard for me to believe that he can have those behaviors at home and nothing at school.  I don't think there's a button, an on/off button, or they're medicating

the water somehow when he goes to school because that's not my kid." [Id. at 207-08.]   Mother's frustration is understandable, but her assumption that Student must have been exhibiting the same problematic behavior at school that he was exhibiting at home is not supported by the record.

For all of these reasons, this Court CONCLUDES that the Hearings Officer erred in disregarding the 2014-15 SPED Teacher's testimony.   To the extent the Decision finds that Student's in-school behavioral/social/emotional levels during the 2014-15 school year were worse than those reflected in the 5/18/15 IEP, this Court CONCLUDES that the finding is not supported by the record.   Thus, this Court FINDS that, based on the information that was reasonably available to the IEP team at the May 18, 2015 meeting, the 5/18/15 IEP accurately describes Student's in-school behavioral/social/emotional levels, and the information did not show that a behavioral reevaluation was necessary.

As to the issue of whether Student's at-home behaviors affected his educational progress, the 2014-15 SPED Teacher testified that Student's behavioral concerns at home "would have a significance" "if it impacted his learning in school," but the school did not observe such an impact.   [12/18/15 Trans. at 433.] In her classroom, Student was able to do a non-preferential task for ten to fifteen minutes without problems.   According to the 2014-15 SPED Teacher, Student needed minimal redirection.   He

received the prompting, redirection, and instructional breaks
that all children in the class received.  [Id. at 471.]
Petitioners have not identified any contrary evidence which shows
that Student's at-home behavioral issues were affecting his
educational progress.

This Court FINDS that the record does not establish
that, based on the information that was reasonably available to
the IEP team at the May 18, 2015 meeting, Student's at-home
behavioral issues were affecting his educational progress.
Further, because they did not affect his educational progress,
this Court CONCLUDES that Student's at-home behavioral issues did
not establish that a behavioral reevaluation was necessary.

### d.   **Tyson Report**

After Mother received the Tyson Report, she contacted
the 2014-15 SPED Teacher to request an IEP team meeting to
discuss Dr. Tyson's ASD diagnosis and what changes needed to be
made to the 5/18/15 IEP before Student started kindergarten.  The
Home School Principal told Mother that they would be "starting
from scratch because it changes his eligibility."  [12/16/15
Trans. at 130-31.]  Mother testified that the meeting took place
in June 2015.  [Id. at 131.]  Mother expected that, at the
meeting, the IEP team would add things to the 5/18/15 IEP, like
agreeing to the implementation of a BSP, "so that when
kindergarten starts everything is already in place and [Student]

won't have that bump at the beginning." [Id. at 142-43.]  Mother

testified that, at the June 2015 meeting, Dr. Royston discussed

the fact that the Tyson Report reflected vast differences in what

the 2014-15 SPED Teacher reported and what Mother reported.

Therefore, the team – except for Mother – decided that they could

not consider the Tyson Report without observing Student first.

[Id. at 135-36.]  Thus, the IEP team did not change the 5/18/15

IEP in any way.  [Id. at 131.]  The PWN for the June 2015 meeting

("6/16/15 PWN") stated: "Reevaluation will be done.  The

following assessment will be completed: observation."  [AR,

Respondent's Exh. 2 at 31.]  The 6/16/15 PWN noted that Mother

presented the Tyson Report, but that the "[s]ignificant

differences between home and school ratings indicate need for

further observation to clarify."  [Id.]

The Hearings Officer found that the Tyson Report

confirmed Mother's reports of Student's behavioral problems, and

therefore the Hearings Officer concluded that the failure to

conduct the requested behavioral assessment constituted a denial

of FAPE.  [Decision at 21-22.]  The Decision recognized that

Dr. Royston testified the Tyson Report reflected that Mother

"rated Student as very elevated on the Social Responsiveness

Scale and Autism Rating Scale; while the [2014-15 SPED T]eacher

had rated Student low and within normal limits" and "this may

show that Student's behaviors at school were different from his

54

behaviors at home." [Decision at 9.] Further, the Hearings
Officer noted that Dr. Tyson recognized that the difference
between Mother's ratings and the 2014-15 SPED Teacher's rating
"suggested that the teacher does not view Student as struggling
with social skills in the academic environment." [Id. at 8.]
The Hearings Officer also noted that Dr. Royston opined that
Dr. Tyson ignored inconsistent findings. [Id. at 9.] The
Hearings Officer recognized that Dr. Royston testified as an
expert in clinical and school psychology, whereas Dr. Royston did
not testify at the due process hearing. [Id. at 8.] Again,
although he did not make a finding that Dr. Royston was not
credible, the Hearings Officer disregard her testimony about the
Tyson Report, and relied on the contents of the Tyson Report in
concluding that the failure to conduct needed behavioral
assessments was a denial of FAPE.

When Dr. Tyson recognized that the differences in the
ratings suggested that the behavioral concerns Mother observed
may not be present at the Home School, Dr. Tyson stated: "While
this is **highly unusual** it may suggest that [Student] works very
hard to 'fit in' at school' . . . ." [AR, Petitioners' Exh. 1 at
15 (emphasis added).] Although recognizing that the situation
was highly unusual, Dr. Tyson apparently did not consider the
2014-15 SPED Teacher's ratings in making her diagnosis and
recommendations. Dr. Royston testified that the drastically

55

different ratings reported by Mother and the 2014-15 SPED Teacher

> says . . . that according to teacher and parent reports, his behavior at school is very different from his behavior at home.  Whether that's a result of . . . him working to fit in or not is speculative.  It's one of the possible reasons for that data to be looking like that.
>
> Q    Is that a reason to not consider the teacher rating scores in your diagnosis of autism?
>
> A    No.

[12/17/15 Trans. at 360.]  Dr. Royston attended the June 2015 IEP team meeting that was convened to discuss the Tyson Report. Dr. Royston offered to observe Student at school because she acknowledged that:

> There are times that teachers sugarcoat and don't see.
>
> There are several signs that teachers might not see that . . . could have been there.  I needed to see whether his behavior was consistent what [sic] the teacher said or not before we could move forward with accepting this as an accurate diagnosis.

[Id. at 367.]  Dr. Royston also noted that it was important to observe Student in school and examine his behavior when he is with peers, which does not occur during an office examination, such as the examinations Dr. Tyson conducted.  [Id. at 367-68.] According to Dr. Royston, the team could not take action upon the data in the Tyson Report "because there's such inconsistencies that Dr. Tyson completely ignored and didn't explain."  [Id. at 368.]

At the due process hearing, Dr. Royston opined that the Tyson Report had "significantly contradictory information, which clearly . . . needed further clarification before a conclusion of autism spectrum disorder could be made." [Id. at 352-53.] Dr. Royston described numerous concerns with the Tyson Report, including, *inter alia*: Dr. Tyson's use of an outdated "diagnostics scale" for Asperger's Syndrome that is merely a screening tool; [id. at 353-54;] the limited description of the information that Student's parents provided on the different reporting scales they had to complete; [id. at 354-55;] insufficient consideration of the 2014-15 SPED Teacher's evaluations and/or explanation of why the data was disregarded; [id. at 356-60, 368;] the use of an ADOS-2 Module that was not age-appropriate because, if the module is too difficult, it will result in an elevated score [id. at 363-65;] internal inconsistencies in the Tyson Report; [id. at 369;] and the fact that "poorly modulated eye contact" was noted as an indication of autism, but it is also "very common" in people with ADHD, and it is also common in young children in general when someone tries to talk to them while they are engaged in an activity [id. at 370-71].

Mother confirmed that, at the May 18, 2015 IEP team meeting, Dr. Royston discussed the vast differences between what the 2014-15 SPED Teacher reported and what Mother reported, and

the other IEP team members decided that they could not consider the Tyson Report without a further observation of Student. [12/16/15 Trans. at 135-36.]  Thus, the team discussed conducting an observation of Student at Summer Fun and/or in the kindergarten classroom.  [12/17/15 Trans. at 397.]

As previously noted, Dr. Tyson did not testify at the due process hearing.  There was no evidence to contradict Dr. Royston's testimony that, based on the information available to the IEP team at the June 2015 meeting and in light of the issues with the Tyson Report, the IEP team could not act upon the Tyson Report without conducting further observances.[12]  Even if the Hearings Officer made an implicit finding that Dr. Royston's testimony that the Tyson Report required further confirmation was

---

[12] Janet Fitzgerald, Psy.D., testified that she reviewed the Tyson Report, and she agreed with the report.  [12/16/15 Trans. at 84, 91; AR, Petitioners' Exh. 1 at 78 (letter dated 10/22/15 from Dr. Fitzgerald stating that her observations support an ASD diagnosis).]  However, because she did not start seeing Student until August 2015, this Court will not consider her observations in evaluating the decisions that the IEP team made in June 2015.

At the due process hearing, Petitioners presented a letter dated November 3, 2015 from Kenneth J. Filbeck, MD, FRACGP, Student's primary care physician.  Dr. Filbeck stated that Student had been his patient since January 2015 and that he saw Student six times (although the letter does not specify when).  He supported "the diagnosis of record – Autism Spectrum Disorder without language impairment and without intellectual impairment," although his primary observations were that of ADHD.  [AR, Petitioners' Exh. 1 at 68.]  He supported the recommendations in the Tyson Report "as reasonable and appropriate for [Student's] ongoing benefit."  [Id.]  However, because the IEP team did not have Dr. Filbeck's letter at the June 2015 IEP team meeting, this Court will not consider the letter in evaluating the decisions that the team made at the meeting.

not credible, the adverse credibility finding is not supported by the record.  This Court therefore CONCLUDES that it was reasonable for the IEP team to defer further action – including conducting a behavioral reevaluation of Student – until it confirmed the findings of the Tyson Report through further observation.[13]

Thus, this Court CONCLUDES that the Tyson Report, standing alone, did not establish that a behavioral reevaluation was necessary at the time of the June 2015 IEP team meeting.

### e.  Summary

The DOE committed a procedural violation of the IDEA by failing to conduct a behavioral reevaluation of Student upon Mother's request.  However, this Court CONCLUDES that the procedural violation did not affect Student's substantive rights because, based on the information that was reasonably available to the IEP team at the May 18, 2015 IEP team meeting and the June 2015 meeting, a behavioral reevaluation was not necessary. Because the procedural violation did not affect Student's substantive rights, it did not result in a denial of FAPE.  This Court therefore GRANTS the DOE's appeal insofar as this Court

---

[13] In August 2015, during the pendency of the Due Process Complaint, Mother gave her consent to allow Dr. Royston to observe Student at the Private School.  [AR, Respondent's Exh. 22 at 215.]

REVERSES the Hearings Officer's ruling that the DOE's failure "to conduct needed behavioral assessments" denied Student a FAPE.

**B.   <u>Mother's Substantive Rights</u>**

The Hearings Officer concluded that Petitioners failed to prove that the DOE denied Student's parents the right to meaningful participation in the development of the 5/18/15 IEP. [Decision at 30.]  Although Petitioners' cross-appeal contends that this was error, Petitioners' Answering Brief/opening brief in support of the cross-appeal does not analyze this point of error.  Even if this Court interpreted Petitioners' brief as pursuing this point of error, this Court would reject Petitioners' argument.

It is undisputed that Mother raised her concerns about Student's behaviors to the IEP team at the May 18, 2015 meeting, but the rest of the team did not agree with her position and did not take the actions she requested.  After Mother received the Tyson Report, she requested another meeting to review it.  The IEP team, however, declined to change the 5/18/15 IEP in light of the Tyson Report.  The 6/16/15 PWN stated that further observation was necessary to clarify the "significant differences between home and school ratings" reflected in the report.  [AR, Respondent's Exh. 2 at 31.]  Thus, although the IEP team did not agree with Mother's positions, it is clear that it considered them.

This Court therefore CONCLUDES that the procedural violation of failing to conduct a behavioral reevaluation upon Mother's request did not affect her substantive rights because it was not the type of violation that infringed on her right to meaningful participation in the development of Student's IEP. See, e.g., Doug C. v. Hawaii Dep't of Educ., 720 F.3d 1038, 1047 (9th Cir. 2013) (holding that "[t]he failure to include [father] in the IEP meeting clearly infringed on his ability to participate in the IEP formulation process"); Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist., 267 F.3d 877, 894 (9th Cir. 2001) (holding that the failure to disclose the student's full records upon parents' request both prevented the IEP team from creating an IEP that addressed her special needs and "prevented [her parents] from participating fully, effectively, and in an informed manner in the development of [her] IEP").

This Court therefore rejects Petitioners' cross-appeal as to this argument and AFFIRMS the portion of the Decision concluding that the procedural violation of the IDEA did not affect Mother's substantive rights.

## IV.  ESY Services

Petitioners' cross-appeal also argues that the Hearings Officer erred in rejecting their claims that: the 5/18/15 IEP failed to offer Student a FAPE because it did not include ESY

61

services; and the IEP team failed to have an appropriate discussion of the ESY issue.

## A.   <u>Appropriate Discussion</u>

First, as the Hearings Officer found in the Decision, the Home School Vice Principal's and the 2014-15 SPED Teacher's testimony at the due process hearing, as well as the Vice Principal's hand-written notes taken during the May 18, 2015 IEP team meeting, confirm that the team discussed whether Student was eligible for ESY.  The team discussed each of the four parts of the DOE's ESY standard: the nature and severity of Student's disability; self-sufficiency/independence; regression; and recoupment.  [12/18/15 Trans. at 407-09, 434-35; AR, Respondent's Exh. 25 at 233-34.]  The Home School Vice Principal testified that "there was a small discussion about behaviors that were taking place at home," but the 2014-15 SPED Teacher told the team that "the behaviors [Mother] was seeing at home were not taking place at school."  [12/18/15 Trans. at 408-09.]  The discussion of at-home behavior is confirmed in the Vice Principal's notes, which also reflect that Mother was concerned about the lack of a structured program for two months.  [AR, Respondent's Exh. 25 at 233.]  Thus, it is clear that the IEP team did discuss ESY eligibility at the May 18, 2015 meeting, and that the discussion included Mother's concerns about Student's behavior.  To the extent that Petitioners' cross-appeal contends that the IEP team

62

failed to consider Student's behavioral issues in determining whether he was eligible for ESY services, this Court rejects their argument.  The team did consider Mother's concerns about his at-home behavior and, as discussed *supra*, he was neither exhibiting the same problems at the Home School nor was his educational progress being affected by his at-home behavioral issues.

Respondent's Exhibit 20 is Student's "Teaching Strategies GOLD" ("Strategies Scale").  It has various objectives/dimensions for the following categories – Social-Emotional, Physical, Language, Cognitive, Literacy, and Mathematics – and "shows . . . where he falls on the scale [for each objective/dimension] based on the rating period which would be either fall, winter or spring." [12/18/15 Trans. at 437.] The Strategies Scale was created based on data that the 2014-15 SPED Teacher kept.  [Id.]  She testified that she used the Strategies Scale in her discussion of the ESY issue.  [Id. at 439.]  She brought it with her to the May 18, 2015 meeting, but could not recall if it was shown to Mother.  [Id. at 466.]  In their cross-appeal, Petitioners argue that the Strategies Scale was not presented at the May 18, 2015 meeting, and that the specific data within the Strategies Scale was not discussed. [Answering Brief at 2.]

While the better practice would have been to provide Mother with a copy of the Strategies Scale, the fact that it was not shown to Mother at the meeting is not enough to establish a denial of FAPE.  At the due process hearing, the 2014-15 SPED Teacher testified that the Strategies Scale shows that, for each category, Student was at levels expected for his age by the end of the 2014-15 school year.  [12/18/15 Trans. at 438-39.] Petitioners did not present any evidence that the 2014-15 SPED Teacher's reading of the Strategies Scale was incorrect or that there were errors in the creation of the document.  Thus, even assuming, *arguendo*, that the failure to provide Mother with a copy of the Strategies Scale was a procedural error at or prior to the May 18, 2015 IEP team meeting, the error was harmless.

Petitioners also emphasize that the 5/18/15 PWN states: "'e) Team **_will_** use data available during the 2015-16 school year to determine if (Student) needs extended school year (ESY) during summer intersession.'"  [Answering Brief at 3 (emphasis Petitioners') (quoting AR, Respondent's Exh. 10 at 131).] Petitioners argue that this "attests that the team based the denial of ESY services on the unavailability of data at the meeting," *i.e.* that the team intended to use data collected during the 2015-16 school year to justify the failure to provide ESY services for Summer 2015.  [Id.]

Petitioners misinterpret the 5/18/15 PWN and take that statement out of context.  The 5/18/15 PWN states, in pertinent part:

> 3.   Description of other options considered:
>
> . . . .
>
> d)   Extended school year during shorter breaks for 2015-16 school year (i.e. October break, winter break, spring break)
>
> e)   Extended school year for kindergarten year (2015-16 school year) during summer intercession
>
> . . . .
>
> 4.   Reasons these options were rejected:
>
> . . . .
>
> d)   Team will use data available during the 2015-16 school year to determine if [Student] needs extended school year (ESY) during shorter breaks (i.e. October break, winter break, spring break)
>
> e)   Team will use data available during the 2015-16 school year to determine if [Student] needs extended school year (ESY) during summer intercession
>
> . . . .

[AR, Respondent's Exh. 10 at 130-31.]  Reading the 5/18/15 PWN as a whole, it is clear that item 4.e refers to the use of data obtained during the 2015-16 school year to determine whether Student needed ESY services during **Summer 2016**, not to justify the previous decision that he was not eligible for ESY services during **Summer 2015**.

This Court therefore rejects Petitioners' argument that the IEP team failed to conduct an appropriate discussion of the ESY issue at the May 18, 2015 IEP team meeting.  To the extent that the Hearings Officer concluded that the there was no procedural violation of the IDEA in the discussion of the ESY issue, the Decision is AFFIRMED.

**B.    Failure to Provide ESY Services**

Petitioners argue that the Hearings Officer erred when he concluded that the failure to offer Student ESY services for Summer 2016 was a denial of FAPE.

This district court has recognized that: "'A school must provide [ESY] services . . . only if the child's IEP team determines that such services are necessary for the provision of FAPE to the child.'" K.K. ex rel. K.S.K. v. Hawaii, CIV. NO. 14-00358 JMS-RLP, 2015 WL 4611947, at *20 (D. Hawai`i July 30, 2015) (alterations in K.K.) (quoting N.B. v. Hellgate Elementary Sch. Dist., 541 F.3d 1202, 1211 (9th Cir. 2008)).  Further,

> "[A] claimant seeking an ESY must satisfy an even
> stricter test, because 'providing an ESY is the
> exception and not the rule under the regulatory
> scheme.'"  [N.B. v. Hellgate, 541 F.3d at 1211]
> (quoting Bd. of Educ. of Fayette Cnty. v. L.M.,
> 478 F.3d 307, 315 (6th Cir. [2007])).  "ESY
> Services are only necessary to a FAPE when the
> benefits a disabled child gains during a regular
> school year will be significantly jeopardized if
> he is not provided with an educational program
> during the summer months."  Id. (quoting MM ex
> rel. DM v. Sch. Dist. of Greenville Cnty., 303
> F.3d 523, 537–38 (4th Cir. 2002)).  "If the child
> benefits meaningfully within his potential from

> instruction under a proper IEP over a regular
> school year, then ESY service may not be required
> under the Act unless the benefits accrued to the
> child during the regular school year will be
> significantly jeopardized if he is not provided an
> [ESY]."  Id. at 1212 (quoting Cordrey v. Euckert,
> 917 F.2d 1460, 1473 (6th Cir. 1990)).

Id. (some alterations in K.K.).  In N.B. v. Hellgate, the Ninth

Circuit noted: "The federal regulation does not specify the

factors to be considered in determining entitlement to ESY

services."  541 F.3d at 1210 (discussing 34 C.F.R.

§ 300.309(a)(1) (1999) ("[e]ach public agency shall ensure that

extended school year services are available as necessary to

provide FAPE" (alteration in N.B.))).[14]

---

[14] The comparable current provision is 34 C.F.R. § 300.106,
which states, in pertinent part:

> (a)   General.
>
> > (1)   Each public agency must ensure that
> > extended school year services are available
> > as necessary to provide FAPE, consistent with
> > paragraph (a)(2) of this section.
> >
> > (2)   Extended school year services must be
> > provided only if a child's IEP Team
> > determines, on an individual basis, in
> > accordance with §§ 300.320 through 300.324,
> > that the services are necessary for the
> > provision of FAPE to the child.
> >
> > (3)   In implementing the requirements of this
> > section, a public agency may not-
> >
> > > (i)   Limit extended school year services
> > > to particular categories of disability;
> > > or

(continued...)

The record clearly establishes that the IEP team discussed the four-part standard that the DOE uses to determine whether a student is eligible for ESY services.  Petitioners have not cited any legal authority – nor is this Court aware of any – which indicates that the DOE's ESY standard violates the IDEA, particularly in light of the authority given to local educational agencies to establish standards for the provision of ESY services.

As to the factor regarding the nature and severity of Student's disability, the 2014-15 SPED Teacher testified that Student was considered developmentally delayed, but that his disability was not considered severe, based on the available data – *i.e.* the Teaching Strategies – which indicated that he was at expected age levels in all measured categories by the end of the 2014-15 school year.  [12/18/15 Trans. at 436-39.]  The team also looked at Student's "Goals and Objective at his present levels." [Id. at 435.]  The data in the Teaching Strategies and the information in Student's PLEPs also address the self-sufficiency/independence factor.

---

[14](...continued)
                    (ii) Unilaterally limit the type,
                    amount, or duration of those services.

34 C.F.R. §§ 300.320-300.324 discuss IEPs and IEP teams generally; they do not address specific requirements for ESY services.  Haw. Admin. R. § 8-60-7 is substantively identical to § 300.106.

Petitioners argue that Student needed ESY services during Summer 2015 to receive a FAPE because of his behavioral issues.  However, this Court has already concluded that the information reasonably available to the IEP team at the time it developed the 5/18/15 IEP – or reevaluated it at the June 2015 meeting – showed that Student was not experiencing behavioral problems at the Home School and that his at-home behavioral issues were not affecting his educational progress.  Similarly, this Court rejects Petitioners' argument that the nature and severity of Student's disability factor and the self-sufficiency/independence factor weighed in favor of ESY eligibility because of Student's behavioral issues.

As to the regression and recoupment factors, the 2014-15 SPED Teacher testified that the IEP team discussed the October break, December break, and March break during the 2014-15 school year.  The October and March breaks were one week each, and the December break was approximately three weeks.  [12/18/15 Trans. at 467-68.]  Student did not have ESY services during those breaks.  See, e.g., AR, Respondent's Exh. 9 (10/21/14 IEP) at 115 (stating that ESY is necessary for the summer school session from June 16, 2014 to July 14, 2014).  The team looked at where Student was prior to those breaks and where he was when he came back after the breaks.  [12/18/15 Trans. at 467.]  During the December break, Student did not experience much regression and

69

recouped pretty quickly.  [Id. at 468.]  Student "came back ready
to learn."  [Id.]  In other words, Student "came back happy and
he came back wanting to do things.  He was excited to be given
activities to do."  [Id. at 472.]

Petitioners argue that the failure to provide ESY
services for Summer 2015 was a denial of FAPE because there was
no "data that demonstrated Student could be without services for
an 8-week period since he had never gone that long without
services before."  [Answering Brief at 2.]  Petitioners' position
is essentially that, once a student is determined to be eligible
for ESY services during a summer session, ESY services must be
provided every year thereafter unless the school collects data
proving that the student can be without services for a length of
time equivalent to the summer session.  According to Petitioners,
this can be done during the school year "by suspending
instruction in an area of need."  [Id. at 3.]  Petitioners cite
no legal authority for these positions, nor is this Court aware
of any.

Moreover, the IDEA does not require a school to provide
ESY services to every student with disabilities to prevent that
student from experiencing any regression.  As previously noted, a
FAPE need not provide the "absolutely best" or
"potential-maximizing" education.  J.W., 626 F.3d at 439
(citation and internal quotation marks omitted).  The FAPE need

only be "appropriately designed and implemented so as to convey [the] [s]tudent with a meaningful benefit." Id. at 433 (citations and quotation marks omitted). Based on the information reasonably available to the IEP team at the relevant times, the team reasonably determined that ESY services were not necessary to convey Student with a meaningful benefit.

It is unfortunate that Student struggled during the Summer Fun program, and it is understandable that Mother was frustrated and disappointed with the removal of ESY services from Student's IEP. As all parents do, Mother wants the best for Student. While Mother's passionate advocacy for her child is commendable, the Hearings Officer and this Court are required to follow the applicable law. In particular, this Court must follow the snapshot rule and consider only the information that was reasonably available to the IEP team at the time it made the decision. To consider Student's difficulties in the Summer Fun program in evaluating the decision not to include ESY services in the 5/18/15 IEP would be to improperly scrutinize the decision through hindsight. Based upon the available information at the relevant time, this Court must AFFIRM the Hearings Officer's ruling that the exclusion of ESY services for Summer 2015 from the 5/18/15 IEP did not constitute a denial of FAPE.

## V.   <u>Amount of Special Education Services</u>

        Finally, Petitioners argue that the 5/18/15 IEP failed to offer Student a FAPE because he requires more than 300 minutes per week of special education services.  The Hearings Officer found:

> Based upon Student's abilities, the Hearings Officer agrees the 300 minutes per week of special education services Student would receive in kindergarten for language arts and math was appropriate.  Petitioners have not shown that Student needs more than 300 minutes per week of special education services in order to make academic progress.

[Decision at 29.]  Based upon this Court's previous rulings – in particular those regarding Student's lack of behavioral issues at the Home School and the undisputed evidence in the record that Student was performing at expected age levels in all categories measured in the Teaching Strategies by the end of the 2014-15 school year – this Court agrees with the Hearings Officer.  This Court FINDS that Petitioners have not identified any evidence in the record that requires the reversal of the Hearings Officer's finding that 300 minutes per week of special education services was sufficient, based on the information that was reasonably available to the IEP during the relevant time period.  This Court therefore AFFIRMS the Hearings Officer's conclusion that Petitioners failed to establish that the 5/18/15 IEP denied Student a FAPE because it only included 300 minutes per week of special education services.

## VI.  <u>Summary and Reimbursement Issue</u>

This Court has VACATED the Hearings Officer's Decision as to his ruling regarding the Child Find issue, and REVERSED the Decision as to his ruling that the DOE's failure "to conduct needed behavioral assessments" affected Student's substantive rights and therefore denied Student a FAPE.  Further, this Court has AFFIRMED the Decision as to: the alleged denial of Mother's substantive rights; the alleged violations of the IDEA regarding ESY services; and the alleged failure to include sufficient minutes of special education services.  This Court therefore CONCLUDES that the 5/18/15 IEP offered Student a FAPE.

Because the 5/18/15 IEP offered Student a FAPE, this Court REVERSES the Hearings Officer's award of reimbursement for the expenses that Petitioners incurred for Student's attendance at the Private School.  This Court notes that Petitioners have only asked this Court to affirm the award of reimbursement if it affirmed the Hearings Officer's ruling that there was a denial of FAPE.  <u>See</u> Answering Brief at 9-10 ("If this tribunal agrees Student 5/18/15 IEP [sic] was procedurally and/or substantively defective, reimbursement can be awarded . . . .").  This Court makes no findings or conclusions regarding any other basis for reimbursement.

## CONCLUSION

On the basis of the foregoing, the Court HEREBY VACATES IN PART, REVERSES IN PART, AND AFFIRMS IN PART the Hearings Office's February 10, 2016 Findings of Fact, Conclusions of Law and Decision.  The Court GRANTS the DOE's appeal insofar as the Court: VACATES the portion of the Decision addressing the Child Find issue; REVERSES the portion of the Decision ruling that the DOE's failure "to conduct needed behavioral assessments" denied Student a FAPE; and REVERSES the reimbursement award.  This Court DENIES Petitioners' cross-appeal and AFFIRMS the Decision in all other respects.

There being no remaining issues in this case, the Court DIRECTS the Clerk's Office to close this case and enter judgment in favor of the DOE on **January 19, 2017**, unless one of the parties files a motion for reconsideration of this Order by **January 17, 2017**.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, December 29, 2016.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

74